UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
++++++++++++++++++++++++++++++++++++++++++++++++++

**J.D. SMITH, JR. and CHARLES W. PIQUET,**

**Plaintiffs,**

**-v-**                                                    **99-CV-2086**

**NEW VENTURE GEAR, INC., DAIMLERCHRYSLER
CORP., Mike Allen as President of UNITED
AUTOMOBILE, AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA LOCAL 624,
Stephen Yokich as President of UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,**

**Defendants.**

++++++++++++++++++++++++++++++++++++++++++++++++++

APPEARANCES:

K. Felicia Davis, Esq.
P.O. Box 591
Syracuse, New York 13201
Attorney for Plaintiffs

Hancock & Estabrook, LLP
John T. McCann, Esq., of Counsel
Lindsey Helmer Hazelton, Esq., of Counsel
1500 AXA Tower I
Syracuse, New York 13221
Attorneys for Defendants New Venture Gear, Inc.
and DaimlerChrysler Corp.

Blitman & King LLP
Kenneth L. Wagner, Esq., of Counsel
Franklin Center, Suite 300
443 North Franklin Street
Syracuse, New York 13204
Attorneys for Defendants Mike Allen as President
of United Automobile, Aerospace and Agricultural
Implement Workers of America Local 624, and Stephen
Yokich as President of United Automobile, Aerospace
and Agricultural Implement Workers of America.

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

In this action alleging racial discrimination, there are three motions presently before the Court: first, a motion to sever (Dkt. No. 151) by defendants New Venture Gear, Inc. and DaimlerChrysler Corp. (collectively, "NVG"), in which the other defendants join by letter (Dkt. No. 159); second, a motion for summary judgment (Dkt. No. 153) by NVG; and third, a motion for summary judgment (Dkt. No. 156) by defendants Mike Allen as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, and Stephen Yokich as President of United Automobile, Aerospace and Agricultural Implement Workers of America (collectively, "union").  For the reasons set forth below, the Court grants both summary judgment motions and denies the motion to sever as moot.

**SECOND AMENDED COMPLAINT**

In their second amended complaint (Dkt. No. 57), both plaintiffs state that they are African-American men.  Plaintiff J.D. Smith, Jr. was hired by NVG on June 6, 1994 and was a dues-paying union member at all times.  He was terminated by NVG on March 17, 1999, allegedly due to his race.  He claims that while an employee of NVG he "endured racial discrimination in that a dual system of discipline existed for Black and similarly-situated non-Black workers, and when he complained about the inequity of treatment given him was subjected to retaliation."  He further avers that the union "failed to work for his return with the same advocacy given to similarly situated non-Black workers with similar work records who engaged in similar or more egregious conduct."

Plaintiff Charles W. Piquet alleges that he was hired by NVG on October 31, 1994 and was a dues-paying union member at all times.  At the time of the second amended complaint, he was "out on medical leave caused by the emotional stress he has suffered from prior acts of racial

discrimination and harassment" at NVG.  He alleges various types of harassment, specifically, unwarranted reprimands, alterations of his attendance record, refusal to give work assignments, and surveillance by his supervisor.  He claims that the harassment became more frequent and intense after he complained.

The first cause of action is against NVG for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII").  The second cause of action is against NVG under 42 U.S.C. § 1981 ("section 1981").  The third cause of action is against NVG for retaliation under Title VII.  The remaining causes of action assert state law claims (the second amended complaint contains two causes of action designated "fourth cause of action," and one fifth cause of action).

## APPLICABLE LAW

Summary judgment is appropriate "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc*., 448 F.3d 573, 579 (2d Cir. 2006) (internal quotation marks omitted).  A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

The Local Rules of the Northern District provide a procedural framework for the resolution of summary judgment motions, placing the burden on the parties to present the evidence that either supports or defeats the motion.  The movant must first submit a Statement of Material Facts setting forth the undisputed facts upon which it relies and specific citations to the

record where each fact is established.  See N.D.N.Y.L.R. 7.1(a)(3).  The court must satisfy itself

that the cited record evidence supports the movant's assertions of fact and that those facts show

that the movant is entitled to judgment as a matter of law.  *New York State Teamsters Conf.*

*Pension and Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005).

Once the movant submits a properly supported Statement of Material Facts, the

non-moving party must file a response thereto.  "Any facts set forth in the [movant's] Statement

of Material Facts shall be deemed admitted unless specifically controverted by the opposing

party."  N.D.N.Y.L.R. 7.1(a)(3).  The Second Circuit has endorsed this rule, noting: "Rules

governing summary judgment practice are essential tools for district courts, permitting them to

efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing]

through voluminous records without guidance from the parties.'"  *Id.* (citing *Holtz v. Rockefeller*

*& Co.*, 258 F.3d 62, 74 (2d Cir. 2001)) (alteration in original).

Plaintiffs' counsel has failed to comply with these rules.  In particular, in many instances

she has failed to set forth in her Statement of Material Facts citations to the record supporting

plaintiffs' factual assertions.  Further, some of her citations to the record appear only in her

Memorandum of Law.  And plaintiffs' Statement of Material Facts does not set forth specific

responses to each factual assertion in movants' Statements of Material Facts.  In the interest of

fairness to the plaintiffs, the Court has made every effort to ascertain exactly what record

evidence they are relying on.  The Court declines, however, to dissect the entire voluminous

record to determine whether there is uncited factual evidence that might support plaintiffs' claims.

## NVG'S MOTION

### I. Plaintiff J. D. Smith, Jr.

**Generally**

Smith claims that his termination resulted from a "dual system of discipline" under which black employees were disciplined more harshly than white employees. He also claims retaliation and hostile work environment.

In support of its motion for summary judgment, NVG contends that Smith was not subjected to a dual system of discipline as alleged in the complaint; rather, he was treated fairly and in a manner consistent with NVG's work rules, policy and procedure, set out in the written "Standards of Conduct." In this respect, NVG relies on the affidavit of Andrew J. Quinn, Human Resources Coordinator and Labor Relations Representative at NVG during the times in question. Quinn's responsibilities included addressing personnel issues such as termination, discipline, labor relations, and benefits, as well as investigating complaints of discrimination and harassment. Quinn states that the work rules are distributed at orientation and posted on bulletin boards throughout the plant. NVG maintains a "Zero Tolerance" policy prohibiting discrimination or harassment in the workplace. Quinn adds that discipline at NVG is administered equally to minority and non-minority employees based on the severity of the situation and the individual facts of each case.

Quinn avers that he is familiar with the facts and circumstances surrounding this action. Regarding the incident resulting in Smith's termination, Quinn's affidavit states: "On March 17, 1999, Plaintiff Smith was involved in a series of confrontations with one of his coworkers, James Reinhardt. Shortly after the incident occurred, the employees involved, including Plaintiff Smith, were interviewed by both NVG representatives and the Dewitt Police." Quinn cites to the Town of Dewitt Police Department Supplemental Report, as well as sworn affidavits from Reinhardt and a witness, Scott C. Warren, showing that Reinhardt denied instigating the altercation and that

-5-

Smith punched Reinhardt in the face with a closed right fist.  Quinn also cites to Smith's own

written statement, dated March 18, 1999, in which he says that he was arguing with Reinhardt,

and then relates as follows: "Jim [Reinhardt] knocks my left arm from in front of him.  I turn and

swing with my right hand at him, and he goes down."

Quinn explains:

> The investigation revealed that Plaintiff Smith had struck Reinhardt in the
> face with a closed fist, causing a cut below his eye, which was severe
> enough to require medical attention. He then went over to two witnesses
> standing nearby and told them "You didn't see anything," in an obvious
> effort to intimidate them. Plaintiff Smith also had a previous record of
> altercations with his coworkers. Plaintiff Smith was terminated based on
> this offense and his past record.
>
> The Union grieved Plaintiff Smith's termination but the grievance was
> ultimately withdrawn. The Appeal Board approved the withdrawal and the
> International Union sustained the Local Union's decision to withdraw. ***
>
> Plaintiff Smith ultimately pled guilty to a criminal offense, second degree
> harassment, as a result of this incident.
>
> The Complaint alleges that Plaintiff Smith's termination was
> discriminatory because it was part of an alleged "dual system of discipline"
> at the plant which imposes more severe penalties on minority employees. I
> am not aware of any support for this theory.

(Citations to record omitted.)

As stated, Quinn affirms that Smith was terminated based on this offense and his past

record.  Quinn summarizes Smith's disciplinary record, which shows a number of incidents

between 1995 and 1998 such as leaving the job without authorization and poor quality

workmanship.  On September 3, 1998, Smith was suspended for using abusive language to others

and on September 17, 1998 he was given a 10-day disciplinary layoff "for using intimidating,

abusive and obscene language towards a member of management."

**Racially discriminatory discharge**

-6-

*Generally*

The legal standard applied to claims of race discrimination under Title VII is the same as that applied to section 1981 claims.  The Court analyzes a plaintiff's race discrimination claim under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  The first step requires the plaintiff to prove a *prima facie* case of discrimination by showing (1) membership in a protected class; (2) possession of basic skills necessary for the job; (3) an adverse employment action; and (4) circumstances giving rise to an inference of race discrimination.  *See Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001).

Where a plaintiff has made out a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999).  The defendant's burden of production is not a demanding one; it need only offer an explanation for the employment decision.  *Id.*

The burden then shifts back to the plaintiff to show "that the proffered reason was not the true reason for the employment decision, and that race was." *Id*. (internal quote omitted).  "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false [then] merges with [his] ultimate burden to persuade the trier of fact that [he] has been the victim of intentional discrimination (*i.e.*, that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Id.* at 446-47.

Applying the first step of the *McDonnell Douglas* analysis to the case at bar, the Court notes that NVG does not dispute that Smith has met the first three elements of a *prima facie* case, *i.e.*, he has shown that he is a member of a protected class, that he possessed the basic skills of the job, and that he experienced an adverse employment action.  Rather, NVG argues that he fails to meet the fourth element, because there is no evidence of any circumstances giving rise to an

inference of race discrimination.  The Court agrees.  In any event, even assuming that Smith has made out a *prima facie* case, NVG has clearly met its burden of articulating a legitimate, nondiscriminatory reason for its actions, *i.e.*, Smith's assault of Reinhardt and his prior disciplinary record.

In an effort to demonstrate that the reason given was not the true reason for the employment decision and that race was, Smith alleges that a dual system of discipline exists at NVG whereby minority workers are disciplined more harshly than non-minority employees. Smith attempts to support this allegation by pointing to specific incidents at the plant and also by relying on an expert report purporting to show by statistical analysis that the severity of disciplinary action at NVG is influenced by race and/or gender

### *Specific incidents of allegedly unequal discipline*

Quinn states in his affidavit that he was "directly involved in or had personal knowledge of most disciplinary actions which rose to the level of a disciplinary layoff or a termination."  He says he has no reason to believe that minority employees were treated differently; discipline was administered according to the facts and circumstances of each individual case.

The complaint alleges "upon information and belief" four incidents of allegedly unequal discipline in which black employees were treated more harshly than similarly situated white employees.  Quinn specifically addresses these incidents.  In the first incident, in March 1999, the complaint alleges upon information and belief that Alfonso Davis, a black man, and Jason Wicks, a white man, engaged in a verbal confrontation in which Wicks used a racial slur, but Davis was disciplined more harshly than Wicks.  Quinn states that NVG's investigation revealed that Davis had physically shoved Wicks.  In the second, in April 1999, the complaint alleges upon information and belief that Steven Rohadfox, a black man, and William McMaster, a white man,

engaged in a physical altercation, and Rohadfox was terminated while McMaster was not.  Quinn

states that NVG's investigation revealed that Rohadfox had confronted McMasters "on top of a

platform and began to physically assault him leaving McMasters with no room for escape."  In

the third, the complaint alleges upon information and belief that David Stone, a white man,

threatened to come into the plant with a gun to kill people in management in May 1999, and was

not terminated but rather only given three months off.  Not only is this not comparable to Smith's

actual physical assault of Reinhardt, but Quinn points out that Smith admitted at his deposition

that he once made a threat that there would be a homicide at the plant and he (Smith) would be in

prison as a result; Smith was not terminated for the threat.  And finally,  the complaint alleges

upon information and belief that two white men, Jim Loveless and Jim Lazero, were observed

fighting outside, that an unnamed company engineer witnessed and reported the fight, and that

neither man was punished.  Quinn states he is not familiar with the incident and does not believe

that, if it occurred, it was brought to the attention of management.  There is no competent

evidence in plaintiffs' opposing papers disputing Quinn's factual averments regarding these

incidents.

Further on the issue of disparate discipline, Quinn notes that plaintiff Charles W. Piquet

testified about an incident in which a white and a black employee engaged in an altercation, and

the white employee was "walked out" of the plant, while the black employee was not; thus, the

black employee was treated more favorably.  The record also contains deposition testimony by

Melvin Flanagan (a black man), who stated that he had a "problem" with one Larry Sealy

(apparently a white man), that it was Sealy's fault, that both were "walked out" of the plant, that

Flanagan was suspended for about a week and eventually was paid for the time he was out, and

that Sealy was suspended for about six months.  Thus, Flanagan was treated less severely than

Sealy.

In their memorandum of law in opposition to the motion, plaintiffs cite to the deposition transcript of Cheri Martin-Weatherly, who stated that, with respect to physical confrontations, blacks are disciplined differently from non-blacks.  She described one incident which she witnessed, involving one Danny Fiore, apparently a white man, who "actually dragged Ron Reid off his truck."  She said Fiore was not punished.  She provided no other information about the incident; thus, the evidence cited fails to show that the incident was sufficiently comparable to Smith's assault of Reinhardt to be relevant on the question of disparate discipline.  With respect to the other incidents Martin-Weatherly described in the pages cited by plaintiffs, she had no personal knowledge but relied on hearsay; this is not competent evidence regarding these events.

Defendants have adduced competent evidence that discipline at NVG was administered according to the facts and circumstances of each individual case and not based on race.  The anecdotal evidence relied on by Smith does not support a finding that NVG administered discipline in a racially discriminatory manner.

*Statistical evidence*

In support of his contention that the reason given for his termination was not the true reason for the employment decision and that race was, Smith also relies on a report dated September 30, 2005, from Steven J. Schwager, Associate Professor of Biological Statistics at Cornell College of Agriculture and Life-Sciences.  This report purports to show that the severity of disciplinary action at NVG is influenced by race and/or gender.  A plain reading of the report discloses that, as Dr. Schwager acknowledges, the data files used "omit most of the information necessary for examination of this question[,]" and "omit[] detailed information about the incidents that led to discipline."  The motion papers do not indicate that plaintiffs attempted to

-10-

obtain further information.  Dr. Schwager discusses the differences by gender and ethnicity in violation rates, which he says is statistically significant.  Even accepting the validity of his statistical method, however, this difference in itself does not support an inference of discrimination, because it wholly fails to address other possible non-discriminatory reasons for the differences.  Likewise, Dr. Schwager's report does not support a finding that whites are disciplined less harshly than blacks for the same violation.  Again, other factors are not taken into account (including, it seems, the employees' prior disciplinary records).  On its face, the report does not provide evidentiary support for Smith's claim of disparate treatment.

In reply, defendants submit a report from Bernard R. Siskin, who received a Ph.D. in Statistics from the University of Pennsylvania, and David W. Griffin, who received a Ph.D. in Economics from Cornell University.  For the past 25 years, they have specialized in the application of statistical methods and economic theory to the analysis of various employment processes within the context of employment discrimination claims.  This report discusses the defects in Dr. Schwager's analysis and concludes that his analysis of "violation rates" fails to meet the minimum professional standard for investigation of the question.  The report further performs an alternative analysis that yields "absolutely no statistical evidence that employee race and/or gender are meaningfully correlated with the severity of discipline."  Plaintiffs did not request an opportunity to rebut this report.

The statistical evidence relied on by plaintiffs fails to support a finding that NVG administered discipline in a racially discriminatory manner.  As such, it does not raise a question of fact in the face of NVG's evidence that Smith's discharge was not discriminatory.

### _Conclusion_

NVG has adduced competent evidence of a legitimate nondiscriminatory reason for

Smith's discharge. The evidence relied on by Smith provides no support for a finding that the reason given was not the true reason for the employment decision and that race was. Smith has failed to present competent evidence on which a reasonable trier of fact could conclude that he has been the victim of intentional discrimination (*i.e.*, that an illegal discriminatory reason played a motivating role in the adverse employment decision). Viewing the evidence in a light most favorable to Smith, the Court finds that NVG is entitled to summary judgment on this issue.

**Retaliation**

The second amended complaint also contains a general allegation that Smith has been the victim of retaliation. To make out a *prima facie* case of retaliation, a plaintiff must show participation in a protected activity known to the defendant; an employment action disadvantaging the plaintiff; and a causal connection between the protected activity and the adverse employment action. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998).

The second amended complaint does not set forth a protected activity known to NVG. The portions of Smith's deposition testimony placed before the Court do not support a finding that he engaged in any specific protected activity, although he describes in general terms some verbal complaints he made to his supervisors about various things. Nor do the cited portions of his testimony support a finding that his discharge was causally connected with any such activity. Smith also acknowledges that the only formal complaint he made was after his discharge; thus, he cannot show a causal connection between the formal complaint and his discharge. Smith does not present evidence on which a reasonable factfinder could find retaliation. Viewing the evidence in a light most favorable to Smith, the Court finds that NVG is entitled to summary judgment on this issue.

-12-

**Hostile work environment**

To make a showing of a hostile work environment sufficient to withstand summary judgment, plaintiff must produce evidence "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999) (internal quotation marks and citation omitted). The first element of a hostile work environment claim has both an objective and subjective component: "the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (internal quotation marks and citation omitted). Relevant factors in determining whether a workplace is permeated with severe or pervasive discrimination include the following: the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or a "mere offensive utterance"; whether the conduct unreasonably interfered with plaintiff's work; and what psychological harm, if any, resulted. *See Richardson*, 180 F.3d at 437 (citing *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993)). For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated or episodic incidents of racial enmity. *See id.*

In reviewing the evidence presented by Smith in support of his claim of hostile work environment, the Court notes that he states for the first time in his deposition that the word "nigger" appeared on the front of his locker shortly after he started working at NVG in June 1994 and that it was never removed before his termination in March 1999. Thus, his claim is that it was there for over four years. There is no evidence from anyone else who saw this. NVG

-13-

submits an affidavit from John Keller, NVG's Corporate Security and Fire Protection Manager, that the locker room was regularly inspected and that if such a word had appeared on a locker, NVG would have removed it promptly.  Keller's evidence that the word would have been removed immediately undermines Smith's reliance on this as evidence of an objectively hostile workplace.  Even accepting as true the improbable allegation that the word remained on the outside of his locker throughout Smith's four years of employment at NVG, it is one word written once, and in itself is not evidence of repeated instances of racial graffiti appearing in the plant.

        In the Memorandum of Law in opposition to the motion, counsel for Smith states that Smith was exposed to "repeated and continuous" racial behavior and incidents that occurred "consistently" and "on a daily basis."  The record evidence cited does not support this characterization.  Smith claims that once during his 90-day probationary period (apparently in 1996) he heard a union official, Gary Dattmore, use a racial epithet when referring to a black coworker.  Smith states that on one occasion an area manager, Frank Rey, referred to Smith with a racial slur.  In a third example, Smith relies on hearsay from one Steven Evans; in reply, NVG submits an affidavit from Evans denying making the statements Smith attributes to him.  With respect to racial graffiti, Smith relies on the testimony of Dixie Cole that on one occasion he observed a reference to KKK written on a piece of cardboard.  Cole added that when he reported this, NVG management investigated and caught the perpetrator.  The only evidence presented in support of counsel's reference to a  "recurrent appearance of hangman's nooses" is the deposition testimony of Zachary Oliver, who testified to a single incident which occurred in April of 2000 – after Smith's termination and after the filing of the instant action.  While Oliver also testified that he was called racially offensive names in 1994 or 1995, Oliver admitted that he did not report the comments.  Counsel also cites to the testimony of Lorenzo Davis in support of the proposition

-14-

that the "disparate discipline of African American workers creates an objectively hostile work environment"; Davis testified, however, that he had no personal knowledge of the circumstances surrounding the discipline of minority employees.

Viewed in its totality, and in the light most favorable to Smith, his evidence does not rise above the level of a few isolated instances spread out over a four-year period. On this record, the Court finds that Smith has failed to present evidence that would permit a reasonable factfinder to find that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of his employment. NVG is entitled to summary judgment dismissing this claim.

**Conclusion**

NVG is entitled to summary judgment dismissing all Smith's claims against it.

## II. Plaintiff Charles W. Piquet

**Generally**

In the second amended complaint (Dkt. No. 57), Piquet alleges that he was hired by NVG on October 31, 1994 and that, at the time the second amended complaint was filed on October 26, 2001, he was "out on medical leave caused by the emotional stress he has suffered from prior acts of racial discrimination and harassment" at NVG. He states that he "has endured racial discrimination as the only Black pipe fitter on third shift via intentional erasure of Plaintiff's attendance and completed work assignments from TMS computer, unwarranted written reprimands, refusal to give sufficient work assignments, supervisor's attempt to secret Plaintiff's time card from slot, intimidating and intrusive surveillance not directed at similarly-situated non-Black workers." He adds that such treatment became more frequent and intense after he complained about it. He also avers that he was moved into the skilled trade area shortly after he

-15-

began working at NVG, whereupon he "began experiencing harassment in the form of

unwarranted written reprimands, a fast track to disciplinary lay off and termination, from Area

Manager, Frank [Rey]."  The second amended complaint further claims:

> For example, in March 1999, Plaintiff Piquet received a final warning
> notice for an excused absence on 3/12/99. Plaintiff Piquet was out of work
> due to illness from 3/12/99 to 3/19/99. Upon information and belief,
> Respondent's Time Management System (TMS) computer program
> generates warning letters concerning employee absenteeism within 72
> hours of the date of the absence.
>
> It appears that the TMS should not have generated a warning letter dated
> 3/25/99 for an absence that occurred on 3/12/99. The warning letter issued
> for Plaintiff Piquet's absence was not generated until nearly 13 days later,
> falling outside of TMS automatic time response. Though, the absence was
> excused it was treated as un-excused
>
> Upon information and belief, Plaintiff Piquet believes that Area Manager,
> Frank [Rey], would have had to authorize the delayed reprimand since a
> direct supervisor does not have the authority or clearance on the TMS to go
> back further than 72 hours to input data concerning an employee.
>
> Frequently, Area Manager, Frank [Rey], has waged a campaign of
> intimidation and harassment against Plaintiff Charles W. Piquet. [Rey's]
> tactics have included "sneaking" down aisles, and hiding behind machines
> to surveillance Plaintiff while working.
>
> In 1999, on one occasion, Plaintiff Piquet had completed a significant
> portion of assigned tasks, when Area Manager [Rey] approached and
> required him to report to his office. Once in [Rey's] office, Plaintiff was
> berated, belittled, and verbally abused by Mr. [Rey]. This occurred despite
> the fact that at the time of Mr. [Rey'] tirade Plaintiff Piquet had completed
> more jobs than any other pipefitter on duty that evening.

(Paragraph numbering omitted.)

**Race discrimination**

> _McDonnell Douglas analysis_

As with Smith's race discrimination claim, the Court analyzes Piquet's race discrimination

claim under the burden-shifting framework of *McDonnell Douglas*, 411 U.S. at 802-04.  The first step requires the plaintiff to prove a *prima facie* case of discrimination by showing (1) membership in a protected class; (2) possession of basic skills necessary for the job; (3) an adverse employment action; and (4) circumstances giving rise to an inference of race discrimination.  *See Slattery*, 248 F.3d at 91.

Where a plaintiff has made out a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *See Bickerstaff*, 196 F.3d at 446.  The defendant's burden of production is not a demanding one; it need only offer an explanation for the employment decision.  *Id.*

The burden then shifts back to the plaintiff to show "that the proffered reason was not the true reason for the employment decision, and that race was."  *Id.* (internal quote omitted).  "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false [then] merges with [his] ultimate burden to persuade the trier of fact that [he] has been the victim of intentional discrimination (*i.e.*, that an illegal discriminatory reason played a motivating role in the adverse employment decision)."  *Id.* at 446-47.

### *Prima facie case*

With respect to the first step of the *McDonnell-Douglas* framework, that is, whether Piquet has carried his initial burden of proving a *prima facie* case of discrimination, NVG does not dispute that Piquet has met the first two elements of a *prima facie* case.  NVG argues that he fails to meet the third and fourth elements, because there is no evidence of any adverse employment action, nor is there evidence of circumstances giving rise to an inference of race discrimination.

Rather than attempt to discern whether certain actions of which Piquet complains actually

-17-

constitute "adverse" employment actions, the Court will accept for the purposes of this motion that they were adverse.  It is doubtful that Piquet has adduced evidence of circumstances giving rise to an inference of race discrimination sufficient to make out a *prima facie* case; however, for purposes of this motion the Court assumes that he has done so.  The Court proceeds to address whether NVG has articulated a legitimate, nondiscriminatory reason for its actions, and whether Piquet has shown that the proffered reason was not the true reason for the employment decision, and that race was, so as to support a finding of race discrimination.

### *Legitimate, nondiscriminatory reasons for NVG's conduct; race discrimination*

In support of its motion for summary judgment, NVG contends that at all times Piquet was treated fairly and in a manner consistent with NVG's work rules, policy and procedure, set out in the written "Standards of Conduct."  NVG relies on Quinn's affidavit, discussed above in connection with Smith's case.  Quinn states that NVG maintained a "Zero Tolerance" policy prohibiting discrimination or harassment in the workplace and that discipline was administered equally to minority and non-minority employees based on the severity of the situation and the individual facts of each case.  Quinn states that Piquet never made any reports to him of racial discrimination or retaliation.

The second amended complaint presents specific allegations regarding only two specific adverse employment actions with respect to Piquet, both occurring in 1999.  The first is the March 12, 1999 incident in which he was issued warning letters resulting from an incorrect entry in the attendance system; the second is an incident in which, after Piquet had completed a significant portion of his assigned tasks, Rey allegedly required him to report to his office and

then berated, belittled, and verbally abused him.[1]  The second amended complaint also sets forth

generalized allegations that, since Piquet moved into the skilled trade area (probably sometime in

1995), he "began experiencing harassment in the form of unwarranted written reprimands, a fast

track to disciplinary lay off and termination, from Area Manager, Frank [Rey]."  Piquet also

alleges that Rey "has waged a campaign of intimidation and harassment" against him, and that

Rey's "tactics have included 'sneaking' down aisles, and hiding behind machines to surveillance

[*sic*] Plaintiff while working."

 Piquet's Memorandum of Law in opposition to this motion alleges three specific adverse

employment actions: the disciplinary layoff in 1996 resulting from a writeup by Mr. Giamartino,

the 1997 suspension, and possibly the March 1999 warning letters.  In addition, Piquet alleges

that he "suffered a number of disciplinary actions ... under the direction of Mr. [Frank] Rey

[Piquet's area manager from 1995 until the sale of NVG in 2004] including verbal reprimands,

written reprimands, suspensions, and disciplinary layoff."

 Considering first the 1996 disciplinary layoff, it appears from Piquet's own deposition that

the disciplinary layoff occurred in 1996 as a result of a writeup by Mr. Giamartino, not Rey.  The

record contains a report by Giamartino dated May 22, 1996, stating that Piquet was being given a

fifteen day disciplinary layoff for unauthorized absence from his assigned work area, setting forth

the details of the incident, and warning Piquet that any further infraction would result in further

disciplinary action "up to and including discharge."  There is no evidence that this incident was

racially discriminatory.  Piquet alleges that Rey "was behind it"; this allegation is mere

unsupported speculation and in any event does not give rise to an inference of race

---

[1]

Piquet's papers on this motion do not appear to refer to this particular alleged incident.

-19-

discrimination.

The second specific adverse employment action is the March 1997 suspension.  NVG relies on an affidavit from Estelle Price, Labor Relations Representative at NVG during the times in question.  Price's responsibilities included personnel issues such as attendance, discipline, labor relations, and general enforcement of NVG's personnel policies.  In her affidavit, Price stated that during the initial years of his employment, Piquet was disciplined for various work related offenses including tardiness, absenteeism, and sleeping on the job, and that this resulted in the March 1997 suspension.[2]  It appears that the final incident precipitating the suspension occurred on Easter weekend 1997 when Piquet was written up for sleeping on the job.  When asked about this at his deposition, Piquet admitted that he "had passed out."  Price further explains that the suspension ended in June 1997, when Piquet was given a "last chance" reinstatement.  His return to work was based on an agreement with NVG, negotiated by the union and signed by Piquet.  This agreement recites that Piquet's attendance record had been unsatisfactory and that his March 30, 1997 discharge was for "sleeping during working hours and past record," and imposes specific future requirements for attendance and timeliness.  The record evidence demonstrates that NVG had a legitimate, nondiscriminatory reason for the 1997 suspension.  Piquet adduces no competent evidence of a racial discriminatory element to the matter.

With respect to the March 12, 1999 incident in which he was issued warning letters, NVG relies on the affidavit from Price showing that Piquet's absence on March 12, 1999 was

---

[2] Piquet was out of work from November 14, 1999 to March 12, 2001.  According to Quinn and Price, between his return to work in 2001 and the time of NVG's sale in 2004, Piquet received no discipline at all.

-20-

incorrectly recorded as excessive personal leave instead of sick leave, but the error was corrected when Piquet notified NVG of the mistake.  According to Price, Piquet told her that he suspected that this was not an error, but rather that a supervisor had intentionally changed his attendance record after the fact; indeed Piquet reported this suspicion of "computer fraud" to the District Attorney's office, which did not pursue the claim.  Price said she explained to Piquet that the manner in which the computer system was set up made such a change impossible.  Price notes that, at the instance of his supervisor, Leonard Pawlewitz, Piquet's sick leave from March 12, 1999 to March 22, 1999 was converted to a disability absence, a change which benefitted Piquet.[3]

As noted, in connection with the March 1999 incident, Piquet avers that his time card was tampered with.  In support of his suspicion that his attendance records were falsified, Piquet states that he saw his supervisor, Pawlewitz, handling his time card.  Pawlewitz, who had been a supervisor at NVG since 1983, stated in his affidavit that in 1999 he supervised Piquet and reported to Rey.  He addresses the time card issue as follows:

> I am familiar with the allegation that I "secreted" Piquet's time card. It is well within a supervisor's purview to review any employee's time card at any time. It is often the easiest way to establish whether an employee is in a plant so large (approximately 1.8 million square feet). This is especially for skilled trades employees not assigned each day to the same location. I do recall at least one occasion where Piquet had not reported to the work area at the beginning of the shift. At around 3 a.m. I saw him wandering around. I did go to look at his card to see when he had punched in. I have done this countless times in the past for various employees who do not report to the work station or whose whereabouts might come into question.

There is no competent evidence that refutes this explanation.  NVG has established a legitimate nondiscriminatory reason for the incident, and Piquet has presented no competent evidence that

---

[3] Price also states that Piquet took numerous leaves of absence in 1999 and only worked for about two months during that year.

could support a finding that the reason given is false and that the real reason is racism.

Piquet refers to the March 1999 incident as proof that the system can be manipulated and records falsified by supervisors.  Particularly in view of Price's unrefuted explanation of the manner in which the March 1999 incident occurred, the incident provides no support for Piquet's unsubstantiated assertion that disciplinary actions against him for time and attendance violations were based on falsified records and that in fact he did not commit the infractions.

With respect to Piquet's more generalized complaint that he was subjected to unwarranted verbal and written reprimands and otherwise treated unfairly by area manager Frank Rey, Rey submits an affidavit stating that he entered the "skilled trades" at NVG in 1966, became a supervisor in 1972, and thereafter was promoted from foreman to general foreman to area manager.  He held the area manager position until he retired in 2001.  He denies racial bias, and states that for many years his supervisor was John Hayes, a black man.

Rey states that Piquet had attendance-related issues; that he was often absent, reported late, or left early; and that "[s]ometimes we had difficulty locating him in the plant for significant periods of time."  Rey recalls being involved in disciplining Piquet but also disciplined Piquet's white co-worker, Don Brosh, for attendance-related issues.  Likewise, Pawlewitz, Piquet's supervisor, affirms that in 1998 and 1999 Piquet had attendance-related issues and "was often absent, reported late or left early."  Also, as noted, the "last chance" agreement signed by Piquet in June 1997 reinstating him after the March 1997 suspension acknowledged that his attendance record had been unsatisfactory.

In her affidavit, Price states that Piquet's disciplinary records show that he was written up by other supervisory personnel besides Rey.  Attached to Price's affidavit are disciplinary writeups of Piquet as follows: on May 22, 1996, he was written up by Giamartino for

-22-

unauthorized absence from his work area (resulting in the disciplinary layoff); on March 30, 1997, he was written up by Jon Johnson for sleeping during work hours; on December 10, 1998, he was written up by Pawlewitz for excessive personal time during work hours; on January 28, 1997, he was written up by Rey for not working his assigned shift; and on March 18, 1997, he was written up by Johnson for being tardy 16 times and leaving work early 35 times during the previous 12 months.  Piquet's assertion that Rey was "behind" the discipline he received from other supervisors is wholly speculative and has no evidentiary support in the record.

The affidavits from Rey, Pawlewitz and Price demonstrate that the discipline meted out to Piquet was justified by his excessive absenteeism and attendance problems.  Piquet presents no competent support for his complaint of unwarranted verbal and written reprimands by Rey.  He did testify at his deposition that once in April or May 1999 he was verbally reprimanded by Rey in the presence of a supervisor, but gives no further details.[4]  Piquet's Memorandum of Law also treats Rey's allegedly excessive "surveillance" of him as an adverse employment action.  Rey's conduct in watching and checking on Piquet is not inherently adverse, particularly in light of the strong evidence of Piquet's persistent attendance issues.  Piquet adduces only speculation and hearsay in support of his assertion that Rey checked on him more than on white employees.  He makes no attempt to show that white employees with similar attendance and tardiness issues were

---

[4]
The deposition page included in Piquet's opposing submissions states that in April or May 1999:
    I was verbally reprimanded severely with Supervisor Bill Robinson present for – by Mr.
    Rey when he caught me in the aisle working, he took me down to his office and called the
    supervisor in and then he verbally, as you'd[...]
At this point the page ends.  The following page is not submitted by Piquet, nor does he cite to it.
Presumably, Piquet does not wish the Court to consider the following page.  Insofar as the Court
is able to ascertain, it is not in the record placed before the Court on the motion.

-23-

not monitored as he was.[5]  NVG has adduced competent evidence showing a legitimate

nondiscriminatory reason for this conduct, and Piquet has presented no competent evidence that

could support a finding that the reason is false and that the real reason is racism.

      Regarding Piquet's complaint that he was not given enough work to do, Quinn explains

that Piquet's job as a skilled tradesman was to respond to orders as they came in; that Piquet

could solicit orders or they could be directed to him; and that either way, the absence of work

orders would not lead to discipline.  He stated that the absence of work orders would not lead to

discipline of Piquet and that he was unaware of any incident in which  Piquet was disciplined for

failing to complete a certain number of work orders during a shift.  Piquet does not cite to

evidence refuting Quinn's averments.  Further on the issue of work orders, defendants rely on

Pawlewitz' affidavit explaining:

> In terms of work assignments, work was distributed equally amongst the
> skilled trades. It was not uncommon at the beginning of third shift for there
> to be work for only one plumber, or possibly no plumbers' work at all. I
> also recall that Piquet was often tardy. To the extent he recalls there being
> no work for him when reported to work, it is more than likely than not
> because he was late in arriving and whatever assignments I may have had
> at the beginning of the shift had been distributed. In any case, I could not
> control the number of work orders that came in or when they came in.
> Irrespective of whether Piquet completed one hundred or ten or no work
> orders in a shift, his pay would not be affected. He was paid based on how
> many hours he was there, not based on the number of work orders he
> completed.

Pawlewitz' affidavit in this respect is supported by the affidavits from Price and Quinn.  As such,

NVG has submitted competent evidence of a legitimate nondiscriminatory reason for the

---

     [5]

In his affidavit Piquet states only:

> Mr. Rey intensively monitored me on a daily basis.  He would make it his business to find
> me no matter where I worked in the plant.  The New Venture Gear plant is a large facility
> ... more than a million square feet.  My seeing Mr. Rey nearly at every turn of my day was
> [not] through coincidence.  It was designed to harass, intimidate, and ridicule me.

distribution of work assignments.  Piquet does not submit competent evidence rebutting NVG's evidence.

Piquet also testified that Pawlewitz "lock[ed] [him] off the [TMS] system and clos[ed] off work orders[.]"  Piquet does not clearly explain whether or how this adversely affected him.  Pawletitz' affidavit states in this regard:

> I am familiar with the allegation that I improperly logged Piquet off the TMS system.  To the extent I had to log Piquet or any other employee off the TMS system it was not improper.  It is necessary to log work orders off the system to show they are done.  There were at times, various employees, including Piquet, who while they might be capable of performing the actual work order repair or service, had difficulty utilizing the TMS computer system.  It was common for me to log off such employees, irrespective of their race, to prevent a back log in the system and the associated documentation it would  generate.  It was not a negative reflection on an employee to have me or any other supervisor log them off.

Pawlewitz' affidavit in this respect is supported by the affidavits from Price and Quinn.  As such, NVG has submitted competent evidence of a legitimate nondiscriminatory reason for the distribution of work assignments.  Piquet has presented no competent evidence that could support a finding that the reason is false and that the real reason is racism.

Piquet also complains that his tool box was vandalized.  Quinn states that toolbox vandalism was a recurring problem in the plant and that several white employees complained of the same problem. Quinn states that there was no evidence to suggest the incidents were related to race.  Piquet does not present any evidence to support a finding that the tool-box vandalism was racially discriminatory.

Further on the issue of race discrimination, Piquet's Memorandum of Law refers to the affidavit of Kevin Burke, a black man who was Piquet's coworker in 1997 while Rey was area supervisor.  Burke's affidavit is not directed towards any particular adverse employment action

-25-

alleged by Piquet.  Rather, it appears that the thrust of Burke's affidavit is that there was racial hostility in the plant.  Burke says that Rey once said to Burke in 1995: "[W]e don't want you in skill [*sic*] trades, and we don't want you in this department."  Burke perceived this to relate to his race because he was the only black millwright working on third shift.  Burke also relates a hearsay incident occurring in 1997 when Piquet was scheduled to work overtime on Easter weekend although he did not want to (presumably this is the incident resulting in Piquet's March 1997 suspension).  Burke's affidavit, a blend of hearsay and speculation, does not aid Piquet in demonstrating that the reasons  given for NVG's actions are false and that the real reason is racism.

   Piquet relies on incidents of alleged racial hostility as evidence of circumstances giving rise to an inference that the adverse employment actions were racially discriminatory.  As discussed below, the allegations do not rise to the level of showing a racially hostile work environment, nor is there evidence linking the alleged hostility to particular adverse employment actions.

   In his Memorandum of Law, Piquet also cites to the report dated September 30, 2005, from Dr. Schwager, performing a statistical analysis that shows racial disparity in discipline at NVG.  For the reasons discussed above in connection with Smith's reliance on this report, the Court concludes that it does not support a finding of racially discriminatory discipline.

   In sum, NVG has adduced competent evidence showing a legitimate nondiscriminatory reason for the conduct of which Piquet complains.  Despite years of discovery and hundreds of pages of depositions, Piquet has presented no competent evidence upon which a reasonable finder of fact could find that he was the victim of race discrimination.  Thus, he fails to raise a question of fact on the issue of race discrimination.  NVG has established its entitlement to summary

judgment dismissing Piquet's race discrimination claims.

**Hostile work environment**

As noted, to make a showing of a hostile work environment sufficient to withstand summary judgment, plaintiff must produce evidence: (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *See Richardson*, 180 F.3d at 436. Piquet states that he subjectively perceived the environment to be abusive; thus, the Court's inquiry focuses on whether the misconduct alleged was "severe or pervasive enough to create an objectively hostile or abusive work environment[.]" *Terry*, 336 F.3d at 148. Factors relevant to this inquiry include the following: the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or a "mere offensive utterance"; whether the conduct unreasonably interfered with plaintiff's work; and what psychological harm, if any, resulted. *See Richardson*, 180 F.3d at 437. For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity. *See id.*

Defendants have demonstrated that the work environment was not hostile. They have done this primarily through the submission of affirmative proof in the above-referenced affidavits of Quinn, Rey, Price, and Pawlewitz, regarding how NVG dealt with its employees.

In his affidavit in support of his claim that he was subjected to a hostile work environment, Piquet states:

> While working under area manager Frank Rey I was discriminated against due to my race, and endured a hostile work environment.
>
> Mr. Rey intensively monitored me on a daily basis. He would make it his business to find me no matter where I worked in the plant. The New

-27-

> Venture Gear plant is a large facility ... more than a million square feet.
> My seeing Mr. Rey nearly at every turn of my day was [not] through
> coincidence.  It was designed to harass, intimidate, and ridicule me.
>
> Mr. Rey would routinely verbally abuse me with language that I considered
> to be racially insensitive.  While I do not recall Mr. Rey calling me the "N-
> word" he would use code words that identified my race.  Often, Mr. Rey
> would yell and scream at me using phrases like "you people."  I never
> heard him refer to my White co-workers in the same way.

In his Statement of Material Facts, Piquet cites to his own deposition testimony to the same effect.

Piquet's deposition testimony also addresses the alleged denial of work assignments, and says his white counterparts were given nightly assignments.  He says that the lack of work assignments "affected his ability to account for his time" and paved the way for disciplinary write-ups.  He relates a single specific incident involving Giamartino.  It appears to be the 1996 incident in which Giamartino could not find Piquet in the plant; Piquet complains that Giamartino should have paged him, but gives no reason to link this incident with lack of work assignments or, indeed, with racism.  With the exception of this incident, Piquet does not attempt to explain who was responsible for denying him the work assignments, for "paving the way" for writeups, and for taking unjustified disciplinary actions against him.  Rather, he simply says in his Statement of Material Facts that he "believes that any disciplinary action taken by supervisors other than Mr. Rey were done at the direction and behest of Mr. Rey."  He does not cite to any record evidence supporting this belief.

As noted above, Piquet submits the affidavit of a black coworker, Kevin Burke.  Burke states that once in May 1995 Rey said to him: "[W]e don't want you in skill [*sic*] trades, and we don't want you in this department."  Burke affirms: "As the only African American millwright working on third shift I perceived his comments to be based upon my race."  Burke adds that soon thereafter he got a negative performance appraisal, that there was an attempt to transfer him to

-28-

another department, and that his direct supervisor, John Priano, said the matter was "out of his hands."  This evidence does not support a finding that Rey was harassing black employees.  Aside from some conclusory statements about racial hostility in the plant, Burke also relates hearsay regarding the incident in 1997 when Piquet was scheduled to work overtime on Easter weekend although he did not want to.

In support of his claim of hostile work environment, Piquet also refers to deposition testimony of black coworkers.  He cites the testimony of Dixie Cole for the proposition that racially offensive graffiti and epithets existed throughout the plant, creating an objectively hostile environment for blacks.  However, Cole's cited testimony refers only to one specific incident occurring "sometime in the 90's" when "KKK" was written on a piece of cardboard.  Cole states that management investigated and caught the perpetrator.  Further with respect to racial graffiti and epithets, Piquet cites to the testimony of Zachary Oliver.  Oliver's testimony refers to comments made by a few coworkers in 1994 and 1995 which Oliver never reported to anyone. The Court notes also that Melvin Flanagan, a black worker, testified that he worked at NVG for 33 years, and that when he first started he would see racial graffiti, but he has not seen any "for the last ten years."

Piquet cites to pages of Lorenzo Davis' deposition transcript in which Davis says he "felt like there were individuals who basically were harassing [him.]"  When asked what incidents he reported, he explained: "They would do this little thing.  They would walk by the job and they would stare and look off, and it was a prolong[ed] stare."  He also complained that his car was scratched.

Piquet also refers in his Memorandum of Law to "the recurrent appearance of hangman's nooses" as establishing the existence of a hostile work environment.  However, he cites only to

-29-

the testimony of Oliver who testified to a single such incident, occurring in 2000.

In further support of his claim of a hostile work environment, Piquet's Memorandum of Law refers to "unchecked racial joking of co-workers in the presence of management"; there are no citations to the record. Perhaps Piquet is referring to the deposition testimony of Douglas Medley, Jr., which is cited in the following sentence in the Memorandum of Law; Medley (apparently a black man) stated generally that there was racial joking and graffiti in the plant. He could only remember one incident, which occurred three or four years previously, when a white coworker called him an "ape"; he did not report it.

The Memorandum of Law also refers to disparate discipline of black workers, citing to the depositions of Melvin Flanagan, Lorenzo Davis, and Douglas Medley, Jr., all of whom are apparently black. These citations refer to the incident involving Flanagan and Sealy and the incident involving Steve Rohadfox and William McMaster, discussed above in connection with Smith's claims. In the deposition pages cited by Piquet, Davis stated that "at one time there was a very large number of African American employees that were discharged at the same time[,]" although he admitted he did not know whether they were discharged for work-related reasons. The Court has already concluded that the report of Dr. Schwager does not provide competent evidence that there was racially disparate discipline at NVG.

To conclude, defendants have adduced competent evidence that the workplace was not permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of Piquet's work environment. In opposition to the motion, Piquet relies in large part on nonspecific, conclusory allegations of racial hostility; these do not assist him in resisting summary judgment. Further, those of Piquet's allegations that have some degree of specificity – such as that Rey monitored him and that he was given few work assignments – were addressed

-30-

by defendants with competent evidence of nondiscriminatory reasons for the actions, and Piquet
does not adduce competent evidence creating a question of fact regarding the validity of the
reasons given.  Many of Piquet's allegations in the Statement of Material Facts and Memorandum
of Law  – for example, that there were recurrent appearances of nooses and frequent incidents of
racial graffiti – are simply not supported by the record evidence cited to the Court.  Other
allegations of allegedly hostile conduct – such as Davis' claim that people walking by would
"stare and look off" – have no apparent racial element.  Further, the specific instances of
coworkers' racial comments described by Piquet and his black coworkers are spread out over
many years, and cannot reasonably be viewed as more than isolated or episodic; moreover, most
of these were not reported to NVG.  Viewed in the light most favorable to Piquet, the evidence
before the Court would not permit a reasonable finder of fact to conclude that Piquet was
subjected to a hostile workplace or that the conduct complained of could be imputed to NVG.
Defendants are entitled to summary judgment dismissing this claim.

**Retaliation**

The second amended complaint also makes a general allegation that Piquet has been the
victim of retaliation.  As noted, to make out a *prima facie* case of retaliation, a plaintiff must
show that he was engaged in protected activity known to the employer, that he suffered an
adverse employment action, and that there was a causal connection between the protected activity
and the adverse employment action.  *See Quinn*, 159 F.3d at 769.  A close temporal relationship
between a plaintiff's participation in a protected activity and an employer's adverse actions can be
sufficient to establish the required causal link for a *prima facie* case.  *See Treglia v. Town of
Manlius*, 313 F.3d 713, 720 (2d Cir. 2002).

Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the

defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action.
*See id.* at 721.  If a defendant meets this burden, the plaintiff must point to evidence that would be
sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a
pretext for impermissible retaliation.  *See id.*

   In opposition to NVG's motion for summary judgment dismissing Piquet's retaliation
claim, Piquet's Memorandum of Law states as follows:

> Mr. Piquet reported several types of conduct to New Venture Gear
> management and to the union. Mr. Piquet reported to Bill Owens, an upper
> manager in Human Resources office, that he was experiencing
> discriminatory and racially motivated treatment by supervisory personnel.
>
> Mr. Piquet informed Mr. Owens, on different occasions, that area manager
> Frank Rey was harassing him on a daily basis. Mr. Rey's harassment
> included: degrading verbal abuse, racially charged language (*i.e.*,
> identifying Mr. Piquet in terms of "you people"), manipulation of his time
> and attendance record to generate disciplinary warnings, intimidating and
> selective monitoring. Plaintiff Piquet had informed Estelle Price, in Human
> Resources about the manipulation of his time and attendance. Mr. Piquet's
> [reports] of these incidents was protected activity, and Defendants were
> aware of this protected activity. Secondly, Mr. Piquet filed a complaint
> with the State Division of Human Rights concerning the complaints that he
> had made to management.
>
> Next, Mr. Piquet suffered adverse employment action. Mr. Piquet was disciplined
> after he complained to management. He was terminated after the meeting with Mr.
> Rey and Billy Owens.  He ...received a letter of disciplinary warning concerning
> his time and attendance, although he had  not abridged the company's rules. In
> addition, he was threatened with firing by Owen  McGraw, upper manager in
> Human Resource office, for filing a complaint with the State Division of Human
> Rights.
>
> The adverse employment actions taken against Mr. Piquet were in close proximity
> to his complaints to management. For example, Mr. Piquet[] was disciplined
> with[in] 90 days of his report to Mr. Owens of Mr. Rey's racial harassment.

   As far as the Court can discern, the only two lines in the Statement of Material Facts that
pertain to retaliation against Piquet are as follows:

-32-

> [T]wo to three months prior to Mr. Piquet's 1997 discharge, Mr. Piquet had
> made a complaint of racial harassment against Mr. Rey with upper
> management; and attempted to have the union file a harassment grievance.
>
> Mr. Piquet believed that his complaint to management about Mr. Rey was
> the reason for his discharge in March 1997.

(Citations to record omitted.)  From the four pages of Piquet's deposition cited in support of these

two sentences, it appears that a few months before his March 1997 suspension, Piquet was in a

meeting with Rey and Billy Owens (who apparently is in upper management) and accused Rey of

racial harassment.

The second amended complaint does not clearly allege retaliation against NVG with

respect to any specific protected activity and resultant adverse employment action and contains no

reference to the March 1997 suspension.  Overlooking this omission, the Court accepts for

purposes of this motion that Piquet has made out a *prima facie* case of retaliation regarding the

suspension, based on the following: his complaint about Rey in the meeting with Owens is a

protected activity, suspension is an adverse employment action, and the two or three month time

lapse between the two is sufficient temporal proximity to make out a *prima facie* case.

NVG's evidence establishes a legitimate non-retaliatory reason for the suspension.  The

affidavit from Price states that "[d]uring the initial years of his employment [which began in

October 1994], Piquet was disciplined for various work-related offenses, including tardiness,

absenteeism, and sleeping on the job[,]" and that these incidents resulted in his suspension in

1997.  His return to work was based on the June 1997 "last chance" agreement with NVG,

negotiated by the union and signed by Piquet.  The agreement recites that Piquet's discharge

effective March 30, 1997, was for "sleeping during working hours and past record,"

acknowledges that his attendance record was unsatisfactory, and imposes specific future

-33-

requirements for attendance and timeliness.

Piquet introduces no evidence that the reason given for the March 1997 suspension is pretextual or that the real reason is race discrimination.  His reliance on "temporal proximity," although it may be sufficient to make out a *prima facie* case, is insufficient to overcome NVG's proof of a nondiscriminatory reason for the suspension.  This is particularly so because the uncontradicted record shows that the suspension was the culmination of a series of work-related offenses resulting in disciplinary actions beginning long before the meeting with Owens.  *See generally Slattery*, 248 F.3d at 95.  And as discussed above in connection with Piquet's claims of hostile work environment and race discrimination, he fails to show that these prior disciplinary actions were the result of discrimination.

As set forth above in connection with Piquet's race discrimination claim, the only other employment actions Piquet alleges that were inherently adverse are the disciplinary layoff in 1996 resulting from a writeup by Mr. Giamartino and possibly the March 1999 warning letters resulting from the incorrect attendance entry.  Apart from these, there is no clearly alleged employment action that had a directly adverse effect on Piquet.  Piquet does not point to evidence that the 1996 layoff resulted from anything other than the various work-related offenses referred to in Price's affidavit.  And he does not adduce evidence which would permit a reasonable factfinder to conclude that the March 1999 warning letters had a retaliatory motive.

In sum, NVG has adduced competent evidence showing a legitimate nonretaliatory reason for the action of which Piquet complains and supporting the conclusion that the action had no causal connection with the protected activity.  Piquet has presented no competent evidence of a causal connection between the protected activity and the alleged adverse action.  Thus, he presents no evidence upon which a reasonable finder of fact could find that he was the victim of

retaliation.  NVG has established its entitlement to summary judgment dismissing Piquet's retaliation claims.

**Conclusion**

NVG is entitled to summary judgment dismissing Piquet's claims against it.

**THE UNION'S MOTION**

**<u>I. Plaintiff Charles W. Piquet</u>**

The fifth cause of action of the second amended complaint asserts Piquet's claim against the union for refusal to file grievances on his behalf.  Piquet alleges that the refusal to file these grievances constituted race discrimination. In a cause of action denominated "fourth" cause of action (the second of two "fourth" causes of action), Smith and Piquet allege breach of contract on the part of the union, apparently based on race discrimination.

The Court first addresses Piquet's claims.  The undisputed facts are that Piquet sought to have the union process a grievance based on the incident in which his sick leave on March 12, 1999 was incorrectly entered as personal leave.  He met with union representatives twice, in April and May 1999, and they refused to pursue the grievance.  On June 7, 1999, Piquet submitted a proposed written grievance to the union alleging race discrimination on the part of Pawlewitz, based on the March 12, 1999 incident as well as Pawlewitz' alleged conduct in logging Piquet's jobs off the computer on April 28 and 29, 1999.  Again the union refused to process the proposed grievance.  Although the second amended complaint is not clear, the Court assumes that Piquet intends to assert race discrimination claims against the union under Title VII (42 U.S.C. §§ 2000e-2(c)), section 1981, and New York State's Human Rights Law, as well as a claim for breach of the duty of fair representation under 29 U.S.C. § 185 and state law (breach of contract).

In order to establish a discrimination claim concerning a union's representation of a

member's interests, there must be a finding that the union breached its duty of fair representation. *See Nweke v. Prudential Ins. Co. of America*, 25 F.Supp.2d 203, 220 (S.D.N.Y. 1998). The duty of fair representation requires a union to represent all members of its bargaining unit honestly and in good faith, without hostility, discrimination, or arbitrary conduct. *See Vaca v. Sipes*, 386 U.S. 171, 177 (1967). To make out a claim that the union breached this duty, Piquet must show that the union refused to pursue a meritorious grievance (*i.e.*, that the employer breached the collective bargaining agreement and the union permitted the breach to go unrepaired) and that the union's actions were motivated by discriminatory animus. *See generally Lee v. ITT Standard and United Steelworkers Local 897*, 268 F.Supp.2d 315, 336 (W.D.N.Y. 2002); *Nweke*, 25 F.Supp.2d at 221.

On this motion, the union contends that it rejected Piquet's proposed grievance solely on the ground of its lack of merit without regard to Piquet's race. The union relies on the affidavit of defendant Michael Allen, president of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624 ("Local 624") at the times in question. Based on firsthand knowledge, Allen explains the structure of the union, the grievance and arbitration procedure established by the applicable collective bargaining agreement, and the manner in which the union handles situations in which an employee believes he or she is the victim of a contractual violation by management. Allen's affidavit responds to the allegations in the second amended complaint and sets forth in detail the circumstances of the union's handling of Piquet's proposed grievance. Allen explains that the matter was handled principally by Jim Kerwin, a union committeeman, who investigated and concluded that the allegations were baseless. Allen's decision that no grievance would be processed was based on the grounds set forth in Kerwin's report, which is attached to Allen's affidavit, as well as his own view that the claim lacked merit.

-36-

Through competent evidence, the union has demonstrated that it investigated Piquet's complaint and determined that NVG did not violate the collective bargaining agreement and that Piquet's proposed grievances lacked merit.  The union has further demonstrated that its refusal to process Piquet's grievances was based on its determination that they lacked merit and not on his race.  For the same reasons discussed above in connection with Piquet's claims against NVG, the record fully supports the union's determination that the proposed grievances lacked merit.  Piquet adduces no evidence that the reason given for the union's determination was false and that it was actually motivated by race discrimination.  Thus, the union has demonstrated that it acted honestly and in good faith, without hostility, discrimination, or arbitrary conduct, and that its conduct was not motivated by discriminatory animus.  Piquet fails to adduce competent evidence upon which a reasonable finder of fact could find in his favor.  The union is entitled to summary judgment dismissing all of Piquet's claims against it.  *See generally Lee*, 268 F.Supp.2d at 343.

## II. Plaintiff J. D. Smith, Jr.

The second amended complaint appears to assert only one claim against the union on Smith's behalf, a state law claim of breach of contract.  Even assuming that Smith also intended to assert Title VII, section 1981, and/or Human Rights Law claims as well as a breach of contract claim against the union, the applicable standard is the same: as discussed above in connection with Piquet's claim against the union, Smith must show that the union refused to pursue a meritorious grievance (*i.e.*, that the employer violated the collective bargaining agreement and the union permitted the breach to go unrepaired) and that the union's actions were motivated by discriminatory animus.  *See generally Lee*, 268 F.Supp.2d at 336; *Nweke*, 25 F.Supp.2d at 221.

In support of its motion for summary judgment, the union relies on affidavits from people with first-hand knowledge of every step in the handling of Smith's grievance.  The affidavit from

Michael Allen, then president of Local 624, responds to the allegations in the second amended complaint and sets forth in detail the circumstances of the union's handling of Smith's grievance in connection with his termination after the assault on Reinhardt on March 17, 1999.  Local 624 handled the grievance through the third step.  According to Allen, on March 25, 1999, Local 624 submitted grievance 109-99 protesting Smith's discharge.  Union steward Odjick spoke to two witnesses of the incident, both of whom indicated that Smith had been the aggressor and had intentionally struck Reinhardt.  In late April or early May 1999, at a third step grievance meeting with NVG's personnel director, Tony Sgarlata, Allen urged that Smith be given another chance and returned to work, but Sgarlata refused.

The matter then proceeded to the fourth step, which is handled by the Regional Office.  Local 624 had no further decision-making authority over the matter and forwarded all materials related to the processing of the grievance to Area Director Neil Falcone for use at the fourth step.  Falcone submits an affidavit stating that he met with Sgarlata to urge Smith's reinstatement, but Sgarlata again refused.  Thereafter Falcone forwarded the file to UAW International Staff Representative Paul R. Cutway, who handled the case at the appeal board level.  Cutway's affidavit sets forth his efforts on Smith's behalf, including four meetings with his counterpart at NVG, Dee (Dagmar) Klimek, at which Cutway unsuccessfully advocated for Smith's reinstatement.  According to Cutway, NVG "was adamant that returning Smith to work was not an option."  Cutway says NVG "maintained that Smith was the aggressor, had prior incidents of intimidating and verbally abusive behavior, poor work habits and relatively low seniority."  Cutway's characterization of NVG's position is confirmed by an affidavit from Klimek.  Cutway states: "[I]n light of the company's firm position, I decided to withdraw the grievance."  He did so in March 2000. He adds:

> In my experienced and honest judgment, the case was not meritorious and
> we would have lost had the case been submitted to the impartial arbitrator
> for determination. In particular, plaintiff Smith's plea and admission of
> guilt to harassment made the case simply unwinnable. My determination to
> withdraw the grievance was absolutely not based on plaintiff Smith's race
> or any other improper factor.

Smith appealed the case to the International Union Executive Board under Article 33 of the UAW International Union constitution. On October 12, 2001, after a hearing, the International Union Executive Board denied the appeal.

The union's evidence summarized above, based on affidavits from union and management representatives with firsthand knowledge, constitutes a competent evidentiary showing that the union fairly represented Smith; that it pursued his grievance through the fourth step in good faith; that it reasonably concluded that NVG did not violate the collective bargaining agreement; that the union's determination to withdraw the grievance and not proceed to arbitration was based on its reasonable conclusion that the grievance lacked merit; that the union represented Smith honestly and in good faith, without hostility, discrimination, or arbitrary conduct; and that the union's actions were not motivated by discriminatory animus.

In opposition, Smith asserts that certain union officials told him that if he pursued his rights, nothing would be done. He also says that one of the committeemen reminded Falcone that one of Falcone's family members also had a pending grievance; Smith states that he "believes that such reference ... was a warning akin to horse-trading tactics designed to limit any advocacy on [Smith's] behalf." Falcone's affidavit denies this, and his explanation of the circumstances provides no support for Smith's suspicion of "horse-trading." In any event, neither of these allegations supports an inference of race discrimination.

Further in opposition, Smith asserts that during their initial conversation, Cutway told him

-39-

"you hit a white guy in the face, and there is nothing I can (will) do."  In his deposition, when questioned about this conversation, Smith testified that Cutway said: "It's an incomplete thing, but I've seen it and what I've seen from your case, you hit a white guy in the face and there's nothing we're going to do or we can do in that line, that I'm helpless."  Cutway emphatically denies making such a statement.  In any event, on this record, this allegation – regarding an isolated statement by only one person among many who were involved in the various steps of handling this grievance – is insufficient to support a finding that the union's conduct was motivated by racial animus.  Further, there is no basis to find that in terminating Smith, NVG violated the collective bargaining agreement.  Nor does Smith present competent evidence in support of his allegation in the second amended complaint that the union "failed to work for his return with the same advocacy given to similarly situated non-Black workers with similar work records who engaged in similar or more egregious conduct."  Smith has failed to adduce evidence raising a material question of fact regarding the fairness of the union's representation.

Accordingly, the Court finds that the union has demonstrated that it handled Smith's grievance fairly, that it reasonably and in good faith determined that NVG did not violate the collective bargaining agreement and that the grievance lacked merit; and that there is no evidence that the reason given for the union's determination was false or that it was actually motivated by race discrimination.  Thus, the union has demonstrated that it acted  honestly and in good faith, without hostility, discrimination, or arbitrary conduct, and that its conduct was not motivated by discriminatory animus.  Smith fails to adduce competent evidence upon which a reasonable finder of fact could find in his favor.  The union is entitled to summary judgment dismissing Smith's claims against it.  *See generally Lee*, 268 F.Supp.2d at 343.

## MOTION TO SEVER

-40-

Inasmuch as the Court grants both motions for summary judgment and dismisses the action in its entirety, the motion to sever is denied as moot.

## CONCLUSION

It is therefore

ORDERED that the motion to sever (Dkt. No. 151) by defendants New Venture Gear, Inc. and DaimlerChrysler Corp., in which the other defendants join by letter (Dkt. No. 159), is denied as moot; and it is further

ORDERED that the motion for summary judgment (Dkt. No. 153) by defendants New Venture Gear, Inc. and DaimlerChrysler Corp. is granted; and it is further

ORDERED that the motion for summary judgment (Dkt. No. 156) by defendants Mike Allen as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, and Stephen Yokich as President of United Automobile, Aerospace and Agricultural Implement Workers of America is granted.

IT IS SO ORDERED.

September 30, 2007
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

-41-